**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **TAREQ ELKHAYYAT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:16-cv-02154-JTF-dkv** |
| | ) | |
| **CITY OF MEMPHIS (MEMPHIS POLICE** | ) | |
| **DEPARTMENT TRAINING ACADEMY),** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant City of Memphis's Motion for Summary Judgment filed on August 25, 2017.  (ECF No. 58.)  Plaintiff Tareq Elkhayyat filed his Response in Opposition to Defendant's Motion for Summary Judgment on October 6, 2017, to which Defendant submitted its Reply on October 27, 2017.  (ECF Nos. 75 & 79.)  Plaintiff, with leave of the Court, filed his Sur-Reply to Defendant's Reply on November 6, 2017.  (ECF Nos. 81 & 82.)  For the following reasons, the Court finds that Defendant City of Memphis's Motion for Summary Judgment should be GRANTED IN PART AND DENIED IN PART.

## FACTUAL BACKGROUND

This case concerns allegations of discrimination in the employment context.  Defendant City of Memphis is a municipal corporation of the State of Tennessee that runs the Memphis Police Department Training Academy ("MPDTA" or "Academy"), which is charged with training cadets to become police officers in the Memphis Police Department ("MPD").  (*See* ECF No. 60-2, 73–74.)  Plaintiff Tareq Elkhayyat, a former cadet in the MPDTA, identifies as a

white, Arab-American of Palestinian descent that is Muslim.  (ECF No. 26, 2:1; *see* ECF No. 75-1, 4:11.)

Organizational Structure

Defendant maintains an Office of Homeland Security ("OHS") as a division of the Memphis Police Department ("MPD").  (ECF No. 75-1, 1:2.)  Officers assigned to the OHS are tasked with addressing threats and hazards that range from tornadoes to terrorism.  (*Id.*)  As part of their duties, OHS officers are assigned to investigate suspicious activity reports ("SARs") that are populated by both federal and state counter-terrorism units and local police officers.  (*Id.*)  Defendant also maintains the Inspectional Services Bureau ("ISB") as a division of the MPD.  (ECF No. 75-1, 2:3.)  Officers assigned to the ISB perform compliance checks, investigate civilian and administrative complaints, and ensure that MPD offices are in compliance with applicable policies and procedures.  (*Id.*)

At all times relevant to the instant action, Anthony Berryhill served as the Deputy Director of the MPD.  (*Id.* at 2:4.)  The Commander of MPD's Training Academy at the time was Vincent Beasley.  (*Id.* at 2:5.)  Kevin Barrett served as a patrolman level officer ("PII") assigned to the MPD's Training Academy as an instructor.  (*Id.* at 3:8.)  All Training Academy command staff reported to Berryhill during the relevant time period.  (*Id.* at 2:5.)  Other actors/officers relevant to the instant dispute include Kenneth Johnson—an investigator assigned to the MPD's ISB division—and Stuart Frisch—a patrolman level officer ("PII") assigned to MPD's OHS division.  (*Id.* at 2:6–2:7.)

Investigation of Plaintiff

Plaintiff submitted an application for admission to MPD's Training Academy on or about September 19, 2014.  (*Id.* at 3:9; ECF No. 79-2:57.)  Subsequently, Plaintiff was named in a

SAR revealing that on September 28, 2014, (*i.e.*, during the application process but prior to Plaintiff being accepted into the MPDTA) Fayette County deputy sheriffs responded to a instance where Plaintiff and his cousin were shooting guns near a cemetery and Plaintiff told the sheriffs he was about to join the MPDTA.  (ECF No. 75-1, 3:10; ECF No. 79-1, 2:58–3:58.)  The SAR was forwarded to OHS and the MPD.  (ECF No. 75-1, 3:10–4:10; ECF No. 79-1, 3:59.)  On or about October 1, 2014, Plaintiff went to the MPDTA for his background check, where Frisch started up a conversation with Plaintiff.  (ECF No. 79-1, 3:60–4:61.)  Frisch scheduled and held an interview with Plaintiff.  (ECF No. 75-1, 3:10.)  Frisch was tasked only with determining whether criminal charges should be filed against Plaintiff for the activity.  (*Id.* at 4:12.)  During the questioning, Frisch asked Plaintiff about his religion and what mosque he attended, and after the interview, Plaintiff filled out a standard memorandum detailing what occurred.  (ECF No. 79-1, 4:62.)  Ultimately, Frisch determined that Plaintiff should not be criminally charged, which he memorialized in an email to Beasley and Lt. Maxine Craig by stating that the OHS investigation concluded and "there are no further issues that we are aware of."  (ECF No. 75-1, 4:12–5:12.)  Plaintiff was then admitted to the Training Academy as a recruit with the 120th Academy class.  (*Id.*; ECF No. 79-1, 5:63.)  During his admission to the Academy, Plaintiff was a Police Officer Probationary Trainee ("PIIPT") with MPD—a probationary employee with no civil service protection for a full year after becoming a commissioned police officer.  (ECF No. 75-1, 5:13.)

Plaintiff's training class began August 24, 2015, and employed six (6) instructors, including Kevin Barrett.  (ECF No. 79-1, 5:64.)  During the outset of training with the Academy, Instructor Barret noticed that subsequent to the period where most nervousness subsides for cadets, Plaintiff "appeared distant or quieter" with "not . . . many changes in expression."  (ECF No. 75-1, 5:15–6:15.)  Finding Plaintiff's demeanor "different from other recruits" and "not

something that's usual[,]" Barrett felt as though Plaintiff "just didn't seem like . . . he wanted to be there."  (ECF No. 75-1, 6:15.)  To determine the best manner in which to approach Plaintiff regarding his unchanging demeanor, and upon running into Frisch at the Training Academy, Barrett sought advice from Frisch.  (*Id.* at 6:16–7:16; ECF No. 79-1, 7:70.)  Barrett's lack of familiarity with Middle Eastern culture as well as his knowledge that Frisch "made trips to the Middle East and [was] aware of Middle Eastern culture" prompted his discussion with Frisch because Barrett thought that Plaintiff's demeanor might be steeped in his culture.  (ECF No. 75-1, 6:16–7:16; ECF No. 79-1, 7:70.)  During the conversation, Frisch indicated that Plaintiff's demeanor would not likely be related to something cultural; despite Barrett only seeking advice as opposed to making an investigatory request, Frisch offered to "look into it."  (ECF No. 75-1, 7:17; ECF No. 76-3, 40:8–40:25, 62:12–62:25; ECF No. 79-1, 7:71.)  Thereafter, in light of the above and a MPD officers' freedom to participate in physical training at the Academy, Frisch planned to visit the academy to participate in physical training with Plaintiff's class.  (ECF No. 75-1, 8:18.)  To get formal approval or ratification of this investigation, Frisch asked Beasley for permission to investigate Plaintiff and/or see Plaintiff's files but Beasley declined; Frisch, instead, got permission to investigate from Lieutenant Steven Chandler, who he refers to as his "superior, superior officer".  (ECF No. 76-7, 31:12–32:20; ECF No. 76-1, 80:19–82:3.  *But see* ECF No. 76-1, 82:4–82:5 (showing Frisch referencing Chandler as his direct supervisor).)  Both Frisch's conversation with Barrett and his subsequent investigation occurred outside the chain of command.  (ECF No. 79-1, 7:72–8:72; *see* ECF No. 76-7, 39:18–43:24.)  It appears that Beasley was informed of the second investigation in an email sent to him on or around September 18, 2015, by Chandler.  (ECF No. 76-7, 30:20–33:3.)

Berryhill first learned of Plaintiff and the second investigation on September 19, 2015, through an email from Beasley that indicated Frisch would be looking into Plaintiff's background based on being named in a SAR.  (ECF No. 75-1, 11:27.)  When Frisch visited the Academy to participate in physical training with Plaintiff's class, he exercised with and in the vicinity of Plaintiff, making various observations and possibly asking him questions like where his family was from and whether he spoke Arabic.  (ECF No. 79-1, 9:75.)  Frisch's initial impression of Plaintiff was that he seemed like a "normal police recruit" with none of the issues of supposed concern identified by Barrett.  (ECF No. 75-1, 8:20; ECF No. 79-1, 9:75.)  Still, both Frisch and Reynolds were tasked with looking into Plaintiff.  (*See* ECF No. 75-1, 8:20–9:21.)  Specifically, Reynolds was tasked with checking databases and social media sites, and Frisch was tasked with conducting meetings with counter-terrorism organizations and the FBI.  (*Id.* at 9:21.)

The results of Frisch's efforts came back negative, but Reynolds social media check did not.  (*Id.*)  The social media check revealed photos of Plaintiff holding a gun with a silencer and other weapons, along with photos posted by Plaintiff's cousin.  (*Id.*)  Defendant characterizes the silencer as illegal and describes the photos as related to Jihadist/terrorism—one allegedly "accusing the American military of war crimes in the Middle East" and one apparently of "a child suicide bomber wearing a . . . head scarf with in [sic] inscription from Islamic Jihad on there[;]" Plaintiff refutes the accuracy of the characterizations.  (*Id.*)  Frisch and Reynolds then turned the social media information over to the FBI for input and to take the lead on the investigation.  (*Id.* at 10:23.)  After consultation with the FBI, whose analyst said certain photos on Plaintiff's cousin's social media were indicative of Islamic Jihad, Frisch was allegedly tasked

with conferring with local prosecuting offices to determine if criminal charges should be filed. (ECF No. 75-1, 9:22, 10:25.)

On September 28, 2015, Frisch and Detective Reynolds interviewed Plaintiff, whereby Frisch questioned him about his travel to Palestine, the businesses owned by his family, photographs of him holding weapons, his cousin Yousef Elkhayyat, photographs posted by his cousin, and his relationship with his cousin. (ECF No. 79-1, 11:80.) After discussing Plaintiff's cousin and potential social media posts from friends, Frisch told Plaintiff, "Let me make something perfectly clear, just in case this wasn't clear, okay? This has nothing to do with your religion, okay? Some of my best friends in the world are Muslim. They follow the religion Islam, and this here has absolutely nothing to do with religion, okay?" (*Id.* at 11:81.) Ultimately, Frisch, in spite of feeling that Plaintiff's behavior was inappropriate, found that Plaintiff's conduct was not illegal, so he briefed Berryhill and wrote a memorandum sent to Berryhill recommending that the investigation regarding Plaintiff be closed. (ECF No. 75-1, 13:30; ECF No. 79-1, 12:82–12:83.) On the same day as Frisch's interview of Plaintiff— September 28, 2015—Deputy Director Berryhill opened an investigation into Plaintiff through the ISB. (ECF No. 79-1, 12:84.) The investigation was then assigned to Detective Kenneth Johnson. (*Id.*)

Detective Johnson initially learned of Plaintiff when he was assigned to investigate an administrative complaint relating to Plaintiff's possible non-compliance with MPD policies and procedures. (ECF No. 75-1, 14:32.) Upon being assigned the investigation, Johnson was provided with a police report from Tipton County and photos from an Instagram account. (*Id.*) Johnson created an investigative file over the course of his investigation into Plaintiff's possible non-compliance with MPD policies and procedures. (*Id.* at 15:33.) As part of this process,

Johnson drafted an affidavit of complaint citing the policies and procedures, or "directives" Plaintiff was believed to have possibly violated at the outset of the investigation along with a narrative outlining Johnson's initial belief regarding the scope of the investigation.  (ECF No. 75-1, 15:33.)   To develop facts related to his investigation into Plaintiff's possible noncompliance with MPD policies and procedures, Johnson and his partner Fred Williams retrieved a copy of Plaintiff's background information, met with Beasley, collected a copy of a memorandum drafted by Barrett related to Plaintiff, met with homeland security officers Frisch and Reynolds, obtained the photos at issue from Plaintiff's social media accounts, and obtained a copy of the interview of Plaintiff conducted by Frisch.  (*Id.* at 15:34–16:34.)  For Johnson's investigation, Frisch provided descriptions of photos relating to Plaintiff found throughout the investigation, although the descriptions are disputed as inaccurate; explained the alleged violative nature and/or illegality of a firearm and suppressor in Plaintiff's possession in a photo, which is disputed; and, according to Johnson, told Johnson that Plaintiff may be in or linked to a terrorist cell, despite his day-before conclusion that nothing supported such a determination.  (*Id.* at 15:33–18:40; ECF No. 79-1, 12:85–13:85.)  As to the latter point, Frisch refutes that he told Johnson anything about his suspicions about Plaintiff or his cousin because his investigation was firewalled.  (ECF No. 79-1, 13:87.)  Johnson relied on much of this information in determining Plaintiff's potential non-compliance with MPD policies and procedures.  (*See* ECF No. 75-1, 16:35–18:40.)  Johnson also visited and photographed Plaintiff's former places of employment and former high school to verify the representations in Plaintiff's background.  (*Id.* at 15:34–16:34.)  Johnson independently reviewed Plaintiff's social media account to review the photos previously received.  (*Id.*)

Thereafter, Johnson compiled everything that he collected over the course of his investigation and prepared questions for his independent interview of Plaintiff. (ECF No. 75-1, 19:42.) The interview of Plaintiff completed Johnson's investigation. (*Id.*) Plaintiff was then charged with violating the following four (4) MPD policies: (i) DR 101-Consorting with Persons of a Bad or Criminal Reputation, (ii) DR 136-Social Media Sites/Internet Content, (iii) DR 401-Display of Firearms; and (iv) DR 606-Reporting Change in Personal Status. (ECF No. 79-1, 14:89.)

DR 110 states, "A member of this department shall not knowingly socialize or have a business relationship with another person, who has been imprisoned or convicted of a felony, or who are [sic] known criminals, except in the performance of their official police duties." (*Id.* at 14:90.)

DR 136 states as follows:

The integrity of the Memphis Police Department must be above reproach. All employees must avoid any conduct which would compromise the integrity of the Department and undercut public confidence in the Department. This includes conduct related to materials posted on personal websites, social media and networking sites (such as Twitter, Facebook, You[T]ube, My[s]pace, etc.) or any material disseminated electronically.

Employees will not post any Memphis Police Department nomenclature, images, logos, emblems, patches, uniforms, or reference the Department on any personal website, social media or networking site, web pages, or on any other electronically transmitted or hard copy material without the expressed permission of the Director of Police Services.

Employees are prohibited from posting, transmitting, or disseminating any digital media that:
  • Could reasonably be interpreted to express the opinions of the Memphis Police Department. A member may comment on a subject of general interest and value or concern to the public, provided that the member does not suggest or imply that the views expressed are those of the Memphis Police Department.
  • Has a reference to the member being affiliated with the Memphis Police Department and contains content that is

> unprofessional, unbecoming or illegal (i.e.[,] lewd sexual conduct, excessive alcohol consumption, or other behavior depicting the member or department in a negative way). Members are reminded that courts may scrutinize the credibility of a witness from external sources such as the internet.
>
> - Could be reasonably interpreted as having an adverse effect upon agency morale, discipline, operation of the agency, or safety of department personnel. ·
> - Contains any audio or video recordings, or images, obtained while engaged in the performance of enforcement activities, department training, tactical situations, or anything having an adverse impact on the Memphis Police Department. This includes, but is not limited to, crime scene photos of any item, photos of victims, witnesses or any evidence. Under no circumstances are photos of minors, (suspects/witnesses/victims) allowed to be reproduced or posted.
>
> Digital images of official departmental ceremonies (i.e.[,] promotional ceremonies or recruit graduations) that do not contain any negative material are permissible.
>
> Clarification on appropriate postings, if needed, shall be directed to the Command Staff.

(ECF No. 79-1, 15:93–16:93.)

DR 401 states, "A member shall not unnecessarily draw, use, or display any firearm." (*Id.* at 17:95.) Johnson found that although Plaintiff did not directly violate the social media policy in DR 136, he did violate the policy when it is read along with DR 401 because he posted photographs of himself holding firearms. (*Id.* at 16:94–17:95.)

DR 606 states, "A member shall report immediately to the supervisor and to the Memphis Police Department Personnel Bureau any change in address, telephone number, legal change of name, change in educational level, notification upon receipt of new certificates, permits, or licenses should also be reported." (*Id.* at 18:99.) Ultimately, Johnson's final investigative report was forwarded to Lt. Adams and Lt. Col. Mickey Williams. (ECF No. 75-1, 21:48.)

<u>Plaintiff's Separation</u>

Thereafter, Berryhill ordered the Academy to Separate Plaintiff.  (ECF No. 75-1, 22:50.) Berryhill testified that he independently made the decision to separate Plaintiff "[b]ased on the totality of the findings in the investigation[,]" including the findings and interpretations of Johnson and Frisch.  (ECF No. 79-1, 19:104–19:105; *see also* ECF No. 75-1, 22:50–23:52.) More specifically, Berryhill, upon Plaintiff's separation, stated that he made his decision based on Plaintiff's violation of the four (4) previously mentioned polices.  (*Compare* ECF No. 76-7, 46:12–47:19, *with id.* at 15 (letter of separation); *see also* ECF No. 75-1, 19:43.)  In his later deposition, appearing to either further articulate his bases or expand his bases for Plaintiff's separation, Berryhill further asserts particular grounds for his separation determination, which are as follows:

- Trespassing upon the premises of a Mosque to shoot semi-automatic weapons which drew the attention of the Fayette County Sheriff's Department;
- Having the Fayette County Sheriff's Department advise the Memphis Police Department of Plaintiff's questionable activities at the Mosque and trespassing, due to the fact that Plaintiff identified himself as a cadet;
- Shooting weapons and eating dinner with a cousin known to law enforcement officials as guilty of unsavory behavior;
- Posting on Instagram a photograph of a semi-automatic weapon placed on a headscarf which is arguably related to Jihadist imagery;
- Being depicted in photographs carrying and/or using semi-automatic weapons;
- Being depicted in a photograph carrying and/or using a semi-automatic weapon with an illegal silencer;
- Socializing with a cousin, whose address Plaintiff used as his own, who posted numerous photographs arguably related to Jihadist terrorism;
- Displaying a noticeably reserved and quiet attitude during cadet training;
- Undertaking the extensive travel to Jordan only to stay three days in a hotel room without leaving; and
- Creating confusion as to his exact residential address.

(ECF No. 79, 10–11.)

## LEGAL STANDARD

In evaluating a motion for summary judgment, federal courts are guided by Federal Rule of Civil Procedure 56, which provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). A fact is "material" if it is capable of affecting the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, summary judgment will not be granted if the nonmoving party presents specific facts, both supported by the record and admissible at trial, that would allow a reasonable jury to find in its favor. *See* Fed. R. Civ. P. 56(c)(1); *Liberty Lobby, Inc.*, 477 U.S. at 256.

To support or oppose a motion for summary judgment, a party may rely on materials in the record, including affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The district court does not have the duty to search the record for such evidence when not explicitly cited by the parties but may, on its own accord, consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3). In assessing the merits of a summary judgment motion, courts must remain mindful that "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts . . . are jury functions, not those of a judge.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 255). Indeed, if the evidence presented, alone cannot

"reasonably support a jury verdict in favor of the nonmoving party, the motion for summary judgment will be granted." *Cox v. Kentucky DOT*, 53 F.3d 146, 150 (6th Cir. 1995).

## ANALYSIS

The Court finds that Defendant's failure, as the movant, to show a lack of genuine dispute as to material facts and that the movant is entitled to judgment as a matter of law on Plaintiff's discrimination claims pursuant to Title VII, 42 U.S.C. § 1981, 42 U.S.C. §1983, and the Tennessee Human Rights Act ("THRA"), precludes this Court from granting Defendant's request for summary judgment on the claims.  Claims of discrimination under Title VII, 42 U.S.C. § 1981, 42 U.S.C. §1983, and the THRA are analyzed under the same burden-shifting framework as established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).  *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004) (noting "'that the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section § [sic] 1983'" (first quoting *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988); and then citing *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1011 (6th Cir. 1987))); *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (noting that claims of race discrimination brought under the THRA and § 1981 are governed by the same burden-shifting standards as claims under Title VII); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

To withstand summary judgment on a discrimination claim, the plaintiff must first either "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003).  A "direct evidence" discrimination case contains proof "which, if believed, requires

the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson*, 319 F.3d at 865. "Indirect or circumstantial evidence of discrimination, on the other hand, permits the inference that the employer acted with discriminatory animus." *Harris v. Giant Eagle Inc.*, 133 F. App'x 288, 293 (6th Cir. 2005). Although Plaintiff asserts that the record contains multiple examples of direct evidence of discriminatory animus, (ECF No. 75, 12–13), the Court finds that, to the contrary, the record is void of evidence that by itself requires a conclusion that Defendant was motivated by some discriminatory animus. Accordingly, the Court analyzes Plaintiff's discrimination claims as if they are based on indirect or circumstantial evidence.

For a plaintiff to present a prima facie case under the *McDonnell Douglas* framework, they must first establish a prima facie case of discrimination or retaliation by showing that (1) they are a member of a protected class; (2) they are qualified for the position; (3) despite their qualifications and employment, they suffered an adverse employment action; and (4) they were replaced by someone outside the protected class or were treated differently than similarly-situated, non-protected employees. *Harris*, 133 F. App'x at 293; *see also Gibson v. Shelly Co.*, 314 F. App'x 760, 768 (6th Cir. 2008). Generally, "to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards[,] and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their

conduct or the employer's treatment of them for it." *Harris*, 133 F. App'x at 293 (quoting

*Mitchell*, 964 F.2d at 583). Even so, the Sixth Circuit has noted the following:

> Courts should not assume . . . that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated; rather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects.

*Gibson*, 314 F. App'x at 771 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154

F.3d 344, 352 (6th Cir. 1998)).

If a plaintiff sufficiently presents a prima facie case, the employer must establish a

legitimate, non-discriminatory reason for the adverse employment action at issue. *Harris*, 133 F.

App'x at 293. The burden is not an onerous one; an employer satisfies its burden as long as it

articulates a valid rational for its decision. *Ross v. City of Memphis*, 394 F. Supp. 2d 1024, 1033

(W.D. Tenn. 2005). If the employer does so, the burden shifts back to "the plaintiff to show that

the proffered reason was pretext intended to obscure the true discriminatory motivations of the

employer." *Id.* To establish pretext, a plaintiff must show that the employer's proffered reason

"(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3)

was insufficient to warrant the challenged conduct." *Johnson*, 319 F.3d at 866 (quoting *Dews v.*

*A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). "Regardless of which option is used, the

plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could

reasonably reject the defendant['s] explanation and infer that the defendants intentionally

discriminated against him.'" *Id.* (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir.

2001)). Moreover, to determine whether a plaintiff has raised a genuine issue of material fact as

to pretext, the Court must consider not whether the defendant's reason for taking an adverse

action against the plaintiff was actually a good reason but, instead, whether the defendant had an honestly held belief that it was. *Hackshaw v. Metro Wire & Cable Co.*, No. 10-13399, 2011 U.S. Dist. LEXIS 110613, at \*23–24 (E.D. Mich. Sept. 28, 2011); *see also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008).

a. Prima Facie Case

Here, at least for purposes of summary judgment, the parties do not dispute that Plaintiff satisfies the first three elements of his discrimination claim under the *McDonnell Douglas* framework. (ECF No. 79, 4.) Indeed, as a Muslim Arab-American of Palestinian descent, Plaintiff is a member of a protected class on the bases of race, religion, and national origin.[1] *See Bah v. Millstone Med. Outsourcing*, No. 12-2396-STA-tmp, 2013 U.S. Dist. LEXIS 126502, at \*18 (W.D. Tenn. Sept. 5, 2013); *see also Deger v. Univ. of Cincinnati*, No. 1:14-cv-420, 2015 U.S. Dist. LEXIS 132758, at \*21 (W.D. Ohio Sept. 30, 2015). Moreover, Plaintiff suffered an adverse employment action by virtue of being separated from the MPDTA, and was likely qualified for the position given his admittance into the MPDTA as a PIIPT. (ECF No. 75-1, 5:13, 22:50; *see* ECF No. 76, 97:16–98:7.) Defendant, then, takes issue with whether Plaintiff has sufficiently established the fourth element of the *McDonnell Douglas* burden-shifting analysis—that Plaintiff was treated differently than similarly-situated, non-protected employees. (ECF No. 79, 11.)

---

[1] The Court notes the apparent dispute of material fact as to whether Plaintiff indicated to the EEOC his intent to seek discrimination claims based on his race, in addition to his national origin and religion. (*Compare* ECF No. 76-2, 35:16–36:24 (asserting that no race claim was filed with the EEOC), *with* ECF No. 1, 4:13 ("After his termination, Mr. Elkhayyat filed a charge of discrimination with the United States EEOC against Defendant alleging discrimination on the basis of race and religion."), ECF No. 26, 4:12 ("After his termination, Mr. Elkhayyat filed a charge of discrimination with the United States EEOC against Defendant alleging discrimination on the basis of religion and national origin.").) Moreover, if Plaintiff's EEOC filing omits to expressly assert a race claim, it is also left to be determined whether facts related to the charged claims would prompt the EEOC to investigate the different, uncharged claim of race discrimination, such that Plaintiff is not precluded from bringing the instant suit based on race discrimination. *See Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010).

Defendant submits that "the City had a rational reason for treating . . . Plaintiff differently than his co-cadets as his conduct was not similarly situated in all relevant aspects to his non-protected fellow students."  (ECF No. 79, 10.)  As provided in the factual recitation above, Defendant asserts a number of reasons to differentiate Plaintiff from any other cadet in the Academy.  (*Id.* at 10–11.)  In response to the proffered differentiations, Plaintiff submits that the record contains (i) no evidence providing a basis in fact for some of the previously-stated reasons; (ii) "clear examples of individuals who committed the same policy violations that he was accused of committing and received no discipline[; and/or (iii)] evidence that no individual was ever disciplined for violations of the same policies and procedures" he was disciplined for. (ECF No. 82, 2–3, 15–17; *see also* ECF No. 75, 13–14.)  The Court, for purposes of organizational clarity, narrows the meaning of "similarly-situated" in the instant context and categorically addresses the parties' contentions on the issue below.

In essence, Defendant argues that because Plaintiff was separated for a number of reasons, even if other cadets may have been guilty of the same individual derelictions, the employees were not similarly situated.  This presents an interesting question: can a plaintiff's ability to make out a prima facie showing that he was similarly situated to other, non-protected employee's be defeated merely by his employer's recitation of a legitimate, non-discriminatory justification for its actions, or must the Court first examine whether the facts underlying said justification are in dispute, and then discount, for purposes of the prima facie analysis alone, any such disputed facts?  *Bush v. Am. Honda Motor Co.*, 227 F. Supp. 2d 780, 791 (S.D. Ohio Sept 6, 2002).  The Court finds the latter the case.

As noted by the Sixth Circuit in *Mitchell*, 964 F.2d at 583, to entertain the merits of an employer's legitimate, non-discriminatory justifications at the prima facie stage would

potentially require Plaintiff to advance at that juncture his third stage rebuttal argument, thus defeating the role of the tripartite analysis engendered by *McDonnell Douglas*. *Bush*, 227 F. Supp. 2d at 792. As a result, the Court must first consider the methods by which a plaintiff rebuts a defendant's proffered nondiscriminatory justification for taking the adverse action, as they were stated by the court in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). *Id.* If a plaintiff attacks the legitimacy of a defendant's justification under the second or third method suggested by that court, *i.e.*, argues that the justification "did not actually motivate the defendant's challenged conduct" or "was insufficient to warrant the challenged conduct", and thus acknowledges the truth of the underlying facts, then it would be proper for the Court to consider the underlying facts at the prima facie stage, as they would not be in dispute. *Id.* However, if a plaintiff challenges the underlying facts giving rise to a defendant's nondiscriminatory justification, *i.e.*, argues the justification has no basis in fact, then before the Court could consider the employer's stated reasons in making its findings as to whether the plaintiff was similarly situated to other employees, it would be necessary to make a determination of whether there existed a genuine issue of material fact with respect to these stated reasons. *Id.* This is exactly the sort of analysis which the Court is to undertake at the rebuttal stage, or third stage, pursuant to *McDonnell Douglas*; to graft this analysis onto the prima facie stage would be to enlarge the plaintiff's initial burden from minimal, to something more substantial, and to blur, if not outright obliterate, the *McDonnell Douglas* framework. *Id.* (citing *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 146 (2d Cir. 1999)). Thus, "where [Plaintiff] has not conceded that [h]e engaged in [the conduct serving as his employer's proffered bases for separation] but instead argues [h]e did not, . . . the Court shall leave its analysis of the

competing positions until the third stage." *Bush*, 227 F. Supp. 2d at 794; *see also Kaufman v. GE*, No. 3:16-CV-00204-TBR, 2017 U.S. Dist. LEXIS 80924, at *12 (W.D. Ky. May 26, 2017).

Plaintiff challenges the underlying facts, through supporting evidence, of many of Defendant's proffered bases for its separation decision. For example, Plaintiff refutes that his alleged violation of DR 606 for failure to update his address has any basis in fact and that such was insufficient to motivate Plaintiff's separation. (ECF No. 75, 15.) Plaintiff also expressly disputes Defendant's claim that he violated DR 110 in so far as his cousin has not been imprisoned, his cousin is not a convicted felon, his cousin is not a known criminal, and, to the extent Plaintiff's cousin is fairly characterized by the above, Plaintiff was unaware of such. (*Id.* at 15–16.) Plaintiff also refutes that any photos mentioned by Defendant contain Jihadist/terrorist subscriptions or associations and contests the accuracy of the descriptions/characterizations of his trip to Jordan. (*See id.* at 17.) Moreover, Plaintiff disputes that, as a factual matter, he was in possession of an illegal silencer. (*Id.*) With Plaintiff challenging the underlying facts of his separation, through record citations, it becomes necessary for the Court to determine whether there existed a genuine issue of material fact with respect to these stated reasons—the exact sort of analysis that the Court is to undertake at the third stage of the *McDonnell Douglas* framework. Thus, the Court finds that the arguments posed by these statements are properly considered as rebuttal, and should not be considered at the prima facie stage to differentiate Plaintiff and other officers/recruits.

In light of Plaintiff disputing much of the factual bases of his separation, the Court finds it must analyze the similarities of Plaintiff's duties and obligations to those he considers his comparators, *i.e.*, other officers and recruits. *Bush*, 227 F. Supp. 2d at 794–95 (Regardless of whether the Court's analysis of the competing positions is left to the rebuttal stage or whether the

Court considers the underlying facts at the prima facie stage, "[T]he Court should not get overly caught up in analyzing merely similarities of the respective employees' conduct. Preliminarily necessary to the equation is its analysis of the similarities of the employees' respective duties and responsibilities. After all, the standard by which the conduct of employee A in department X is judged may not be the standard by which the conduct of employee B in department Y should be judged."); *see, e.g.*, *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 732 (6th Cir. 2000) (finding that a plaintiff could not make a prima facie showing of gender discrimination where facts showed that others identified by the plaintiff as "similarly situated" had different job functions and responsibilities and therefore could not be held to the same standards of conduct).

In the instant case, the Court finds that all MPD officers and recruits are similarly situated because they are subject to the same relevant duties and obligations.[2] The Court notes that under Defendant's organizational structure, officers and recruits appear to retain different immediate supervisors and that, in some instances, "Academy rules and regulations concerning trainees vary from Departmental rules and regulations . . . ." (ECF No. 60-2, 138; *see* ECF No. 75-1, 2:5; ECF No. 76-1, 82:4–82:14.) Nonetheless, the record and common sense suggests that these facts do not prevent a finding by this Court that, for purposes of Plaintiff's instant claims, officers and recruits are similarly situated. (*See, e.g.*, ECF No. 76-3, 77:15–78:16.) The identity of the immediate supervisor of a recruit or an officer is not relevant here, in part, because the MPD chain of command ends with a common supervisory authority. (*See* ECF No. 76-1, 82:4–82:14; ECF No. 76-3, 90:3–90:15.) More importantly, both officers and recruits are held to the same if not substantially-similar standards and expectations, (*see* ECF No. 60-2, 138 (showing that the "Policies and Procedures" of the MPD apply to trainees)), and are subject to the same

---

[2] This conclusion is broader in consideration than that offered by Defendant, insofar as it considers recruits comparable to both other recruits and officers, not just other recruits.

departmental policies and procedures (including the duties and obligations articulated thereunder). (*See* ECF No. 76-5, 107:24–108:12; *see also* ECF No. 75-1, 22:49.) Even with respect to discipline, the record reasonably supports the conclusion that, officers and recruits are not significantly distinct. (ECF No. 76-3, 90:3–90:15. *But see id.* at 90:16–90:25.) Moreover, regarding the policies or regulations that serve as the alleged bases of Plaintiff's separation, nothing in the Academy rules and regulations appears to contradict or supersede that contained in the departmental rules and regulations. (*See* ECF No. 60-2, 138 (noting that "Academy rules and regulations shall prevail [over Departmental rules and regulations] in the event that they are more extensive or restrictive than those of the department").) Thus, even if an officer and a recruit with different immediate, lower-level supervisors committed the same act in violation of Departmental rules and regulations and the lower-level supervisors found one officer in violation but not the other, both could still be found in violation because such a determination is ultimately left to the same final decisionmaker and contemplates, in large part, the same Departmental rules and regulations. (*See, e.g.*, ECF No. 76, 42:24–43:5; ECF No. 76-3, 90:3–90:15.) As a result, Plaintiff may properly analogize his situation with that of a recruit or an officer.

*DR 136/ DR 401*

As far as the factual bases of Plaintiff's separation that he does not dispute, the Court considers the similarities in conduct of Plaintiff and Defendant's employees below. Defendant found that Plaintiff violated DR 136 (Social Media Sites/Internet Content) and DR 401 (Displaying Firearms) and that said violations, in part, resulted in Plaintiff's separation. As an initial matter, the Court notes that, although it is not clearly articulated by Berryhill, Plaintiff's alleged violation of DR 136 could only occur when considered in conjunction with his alleged use of a firearm, possession of a silencer, or association with Jihadist/terrorist related activities,

persons, or photography.  (*See* ECF No. 76-5, 76:4–76:9.)  The only factual basis proper for analysis at this stage, however, concerns the alleged display of a firearm because Plaintiff refutes the illegality of the silencer and the characterization of Jihadist/terrorist related activities, persons, or photography.  To the extent such is the case, the Court notes that Defendant appears to inextricably intertwine Plaintiff's violation of DR 136 with DR 401.

To attack the legitimacy of Defendant's justification and contend that Defendant treated Plaintiff differently in finding this violation than similarly-situated, non-protected employees, Plaintiff provides evidence that Plaintiff's MPDTA Instructor/Officer Suttle (an African-American non-Muslim male) has photographs on Facebook of him holding a big gun, and that likewise, seven (7) of his classmates, *i.e.*, other recruits, all posted photographs of themselves on social media with firearms, (ECF No. 79-1, 17:97–18:98); Plaintiff states that none of these persons are Muslim, Arab-American, or of Palestinian descent.  As noted by Johnson, an inquiry into a social media account by MPD may occur in only one of two ways: a civilian complaint or an administrative complaint that has come through the chain of command from the deputy director or the director.  (ECF No. 76-5, 107:1–107:23.)

Here, no civilian complaint was made against Plaintiff.  Moreover, the parties agree that the second investigation of Plaintiff (which involved Frisch and resulted in the initial check, of Plaintiff's social media) was initiated and occurred outside the chain of command and without the authority of the MDPDTA's commanding officer.  (ECF No. 79-1, 7:72–8:72; *see* ECF No. 76-7, 39:18–43:24.)  This gives rise to two (2) points of interest.  First, Frisch and/or Barrett went against entity policy, authority, and/or the chain of command to initiate and/or continue the second investigation of Plaintiff, the implications of which the Court will discuss later in its analysis.  Second, if a formal administrative complaint goes through the chain of command but

the initial complaint against Plaintiff here (and its resulting investigation) occurred outside of the chain of command, then the investigation of Plaintiff's social media account was not based on a formal complaint but, rather, an informal suspicion (of Barrett and/or Frisch), regardless of whether a formal complaint was later filed.  To the extent that an informal suspicion would lead to a review of an officer's or recruit's social media page, the Court notes that Defendant, by virtue of this lawsuit and as evidenced by deposition testimony, has long been made aware of one instructor and seven other officer/recruits with pictures of themselves holding guns on social media.  (ECF No. 76-5, 79:24–89:22; ECF No. 79-1, 17:97–18:98.)  Johnson and Barrett, for example, testified that they know employees in violation of the rule, but no Complaint or investigation has been lodged in regards thereto.  (ECF No. 76-3, 86:14–87:7; ECF No. 76-5, 78:19–79:10.)  Such notice, surely, would constitute a reasonable suspicion that these officers/recruits are violating DR 136 individually or in conjunction with DR 401, and yet, unlike Plaintiff, none of these officers/recruits' had formal complaints filed against them and their social media sites were not investigated or found in violation of DR 136/ DR 401.  (ECF No. 76-5, 89:3–89:22; *see* ECF No. 76-3, 86:14–87:7 (showing that Barrett knows multiple officers that post pictures of weapons on social media but that none, except maybe one, was disciplined as a result).)[3]  Accordingly, a reasonable jury could conclude that as it relates to Plaintiff's alleged violation of DR 401 and/or DR 136, for display of a firearm, Plaintiff was treated differently than similarly-situated, non-protected employees.

Although Defendant's justifications for Plaintiff's separation also include the Fayette County incident and Plaintiff displaying a noticeably reserved and quiet attitude during cadet

---

[3]  The Court notes that Officer Barrett testified that one other officer may have been fired for posting a picture or cartoon of a play gun being pointed at a black kid, but he does not know for certain.  (ECF No. 76-3, 87:5–87:19.)  The Court does not find that this testimony is necessarily sufficient to preclude a reasonable jury from finding that Plaintiff was treated differently than other similarly-situated officers and recruits, as to the instant conduct/allegation.

training, the Court finds that, such does not sufficiently demonstrate that Plaintiff has not shown a prima facie case for discrimination or that this Court should stop its discrimination inquiry here. Thus, construing all the evidence in Plaintiff's favor and considering the totality of the circumstances, the Court finds that Plaintiff has presented circumstantial evidence sufficient to create an inference of discrimination necessitating a more detailed exploration of the purported reasons for his separation.

b. Nondiscriminatory Justification

The Court finds that Defendant provides legitimate, nondiscriminatory reasons for its separation of Plaintiff. As previously noted, Defendant submits that Plaintiff had a rational reason for separating Plaintiff based on the following:

- Trespassing upon the premises of a Mosque to shoot semi-automatic weapons which drew the attention of the Fayette County Sheriff's Department;
- Having the Fayette County Sheriff's Department advise the Memphis Police Department of Plaintiff's questionable activities at the Mosque and trespassing, due to the fact that Plaintiff identified himself as a cadet;
- Shooting weapons and eating dinner with a cousin known to law enforcement officials as guilty of unsavory behavior;
- Posting on Instagram a photograph of a semi-automatic weapon placed on a headscarf which is arguably related to Jihadist imagery;
- Being depicted in photographs carrying and/or using semi-automatic weapons;
- Being depicted in a photograph carrying and/or using a semi-automatic weapon with an illegal silencer;
- Socializing with a cousin, whose address Plaintiff used as his own, who posted numerous photographs arguably related to Jihadist terrorism;
- Displaying a noticeably reserved and quiet attitude during cadet training;
- Undertaking the extensive travel to Jordan only to stay three days in a hotel room without leaving; and
- Creating confusion as to his exact residential address.

(ECF No. 79, 10–11.)

The above reasons, at least in part, contemplate the four (4) policies Plaintiff was originally found in violation of. (*Compare* ECF No. 76-7, 46:12–47:15, *with id.*at 15 (letter of separation);

*see also* ECF No. 75-1, 19:43.)  A violation of an MPD policy and/or procedure serves as an independent basis for termination.  (*Id.* at 22:49.)  Thus, to the extent that Defendant separated Plaintiff based, at least in part, on a violation of an MPD policy or procedure, such constitutes a sufficient, legitimate reason for the separation.  *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. July 13, 2012).  Given that this burden is merely one of production, not persuasion, *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009), the Court finds that Defendant has satisfied its burden at this stage of the framework.

c. Pretext

*DR 136/DR 401*

The Court finds that a dispute of material fact exists regarding whether Plaintiff's alleged violation of DR 136 and DR 401 for the display of firearms on social media was pretext for unlawful discrimination.  Defendant found that Plaintiff violated DR 136 (Social Media Sites/Internet Content) in conjunction with DR 401 (Displaying Firearms) and that said violation served as one of the grounds of Plaintiff's separation.  As noted by Johnson, an inquiry into a social media account occurs in one of two ways: a civilian complaint or an administrative complaint that has come through the chain of command from the deputy director or the director. (ECF No. 76-5, 107:1–107:23.)

Here, no civilian complaint was made against Plaintiff, and the parties agree that the second investigation of Plaintiff (which involved Frisch and resulted in the social media check) was initiated and occurred outside the chain of command and without the authority of the MDPDTA's commanding officer.  (ECF No. 79-1, 7:72–8:72; *see* ECF No. 76-7, 39:18–43:21.) This gives rise to the previously articulated point that Barrett and/or Frisch went against entity policy, authority, and/or the chain of command to initiate and/or continue the second

investigation of Plaintiff.   A deviation from procedures supports a jury finding of pretext, *Roschival v. Hurley Med. Ctr.*, 695 F. App'x 923, 929–30 (6th Cir. 2017); the Court finds this especially so, whereas here, Barrett and Frisch's initiation and investigation of Plaintiff occurred outside the scope of their authority and the chain of command—arguably something more than a deviation from normal procedure.   Moreover, to terminate Plaintiff based on the instant alleged violation, Berryhill relied on the investigative findings and conclusions of Frisch and the recommendation of Johnson.   (ECF No. 76, 24:20–25:7, 42:5–42:9; *infra* p. 38.)   Johnson's recommendation to Berryhill to terminate Plaintiff based on the above violation was the result of Frisch's descriptions and conclusions regarding photos associated with Plaintiff's social media account(s).   *Infra* p. 40.   A reasonable jury could determine that some of the alleged information reported to Berryhill and Johnson by Frisch, however, arguably has no basis in fact, as discussed throughout this Order.   *See infra* p. 40.   Also of note, is that despite DR 136 and DR 401 prohibiting Defendant's employees from posting, transmitting, or disseminating digital media that amounts to a display of firearms, the record contains evidence that Plaintiff did not post, transmit, or disseminate any photos, including those containing weapons, while he was an employee.   (ECF No. 76-2, 207:11–207:13.)   The Court finds that the above facts reasonably call into question whether Defendant's instant justification has any basis in fact, weighing against this Court granting Defendant's summary judgment request.

*DR 606*

The Court finds that a reasonable jury could determine that Plaintiff's alleged violation of DR 606 for failure to update his address was pretext for unlawful discrimination.   Plaintiff contends that the alleged violation has no basis in fact and was insufficient to motivate Plaintiff's separation.   (ECF No. 75, 15.)   DR 606 states, "A member shall report immediately to the

supervisor and to the Memphis Police Department Personnel Bureau any change in address, telephone number, legal change of name, change in educational level, notification upon receipt of new certificates, permits, or licenses should also be reported."

Here, Plaintiff's argument that the violation of DR 606 found by Defendant has no basis in fact is not well-taken because the evidence shows that Plaintiff only listed one out of two of his then current residences.  (ECF No. 76-5, 96 (Bates No. COM-ELKHAYYAT 000585); ECF No. 79-1, 18:100–19:100.)   Plaintiff's attack on the sufficiency of Defendant's instant justification through evidence tending to show that no officer/recruit has even been terminated for not updating their address other than Plaintiff, however, favors his pretext argument on the instant claim.  (ECF No. 76-5, 92:16–92:25.)  The fact that no officer/recruit has been separated for failure to update their address, would support a reasonable jury finding that the proffered violation of DR 606 was pretext for unlawful discrimination.

Defendant, however, appears to take issue with any attempt by Plaintiff to use the same evidence employed to satisfy his prima facie case to also satisfy his pretext argument.  (ECF No. 79, 5.)  It is true that, "in order to make [the rebuttal showing required by the burden shifting approach of *McDonnel Douglas*,] Plaintiff may not rely simply on his prima facie evidence, but must, instead, introduce additional evidence of . . . discrimination."  *Manzer*, 1084.  Here, however, the assertions made by Plaintiff to show pretext on the instant issue were not used as prima facie evidence.  *See supra* p. 18, *see also Bush*, 227 F. Supp. 2d at 793 ("Succinctly put, the example provided in *Manzer* concerning a plaintiff's ability to show that his employer's proffered reasons were insufficient to justify the adverse action by showing evidence that other 'similarly situated' employees were not so acted upon (*i.e.*, Manzer's third method of rebuttal) does not apply to a *prima facie analysis* of whether some employees were 'similarly situated.'

To demonstrate that a plaintiff was 'similarly situated' to others for the purposes of making out a prima facie argument, [h]e need not demonstrate that the others to whom [h]e compares h[im]self also committed the same derelictions of which [h]e is accused, *if [h]e disputes those accusations*. If [h]e were so required, the *McDonnell Douglas* tripartite paradigm would be a muted doctrine."); *Manzer*, at 1084–85 (first noting that the pretext arguments that an employer's proffered reason has no basis in fact or is insufficient to motivate discharge are direct attacks on the credibility of the employer's proffered reason and then concluding that "a plaintiff must introduce some evidence of . . . discrimination other than his prima facie case where there is not evidence which directly challenges the credibility of the employer's proffered explanation").  For the above reasons, the Court finds that a reasonable jury could determine that Plaintiff's alleged violation of DR 606 for failure to update his address was pretext for unlawful discrimination.

*DR 110*

A reasonable jury could also find that Plaintiff's alleged violation of DR 110 for consorting with persons of a bad or criminal reputation was in fact pretext for discrimination. Plaintiff expressly disputes the factual bases of Defendant's claim that he violated DR 110, arguing that his cousin has not been imprisoned, his cousin is not a convicted felon, his cousin is not a known criminal, and, to the extent Plaintiff's cousin is fairly characterized by the above, Plaintiff was unaware of such.  (ECF No. 75, 15.)  DR 110 states, "A member of this department shall not knowingly socialize or have a business relationship with another person, who has been imprisoned or convicted of a felony, or who are [sic] known criminals, except in the performance of their official police duties."  (ECF No. 79-1, 14:90.)  Additionally, according to Johnson, an officer/recruit cannot socialize or have a business relationship with a person of "bad or climbing criminal reputation", *i.e.*, a person who is constantly in contact with law enforcement where they

27

are listed as suspects or they are being arrested for various violations.  (ECF No. 79-1, 14:90.)

Johnson determined that Plaintiff's cousin retained such a reputation based on three reports of

interactions with law enforcement that occurred over a twelve (12) year span.  (*Id.* at 14:91.)

The three (3) incidents consisted of the following: (1) a 2003 incident when Yousef was nine (9)

years old and allegedly pointed a pocket knife at a neighbor, but no citation was issued, no

charges were pressed, and no injuries occurred; (2) a 2009 Shelby County Sheriff's Office report

in which Yousef was questioned following a complaint that he was shooting guns on private

property off Pisgah Road, although no citation was issued, no arrest was made, and no charges

were filed; and (3) a 2015 Shelby County Sheriff's Office report that Yousef was issued a

misdemeanor citation for possession of marijuana.  (*Id.* at 14:91–15:91.)

Here, a number of facts would allow a reasonable jury to find that Plaintiff's separation

for an alleged violation of DR 110 was pretext for unlawful discrimination.  First, Plaintiff's

cousin has neither been imprisoned nor convicted of a felony, and nothing in the record clearly

supports the conclusion that he is a "criminal" under DR 110.   Furthermore, contrary to

Defendant's finding, a reasonable jury could determine that Plaintiff's cousin was not a person

constantly in contact with law enforcement as a listed suspect given that the record shows the

police were contacted about Plaintiff's cousin approximately three (3) times over a twelve (12)

year period for offenses that were relatively minor, did not result in any arrest or felony

conviction, and two (2) of which were committed when he was of minority age.  Even more, if

Plaintiff's cousin was fairly characterized as a person officers/recruits are prohibited from

associating with or having a business relationship with, the record contains evidence that

Plaintiff cannot be attributed with knowledge of this, (*see* ECF No. 76-1, 179:6–179:21), a

conclusion even Defendant made during its investigations, (ECF No. 76-5, 103:9–103:25), and

that Plaintiff did not have any associations with his cousin after being accepted in the Academy, (ECF No. 76-5, 96:2–96:8), allowing a reasonably jury to conclude that Plaintiff did not "knowingly" associate with a prohibited person under DR 110. Thus, a reasonable jury could determine that Defendant's assertion that Plaintiff was separated for violating DR 110 was pretext for unlawful discrimination.

*Fayette County Incident*

A reasonable jury could further determine that Defendant's termination of Plaintiff based on the Fayette County incident was in fact pretext for unlawful discrimination. Defendant asserts that Plaintiff was separated, in part, based on the Fayette County Incident with Plaintiff and his cousin. As Plaintiff points out, however, that incident occurred prior to Plaintiff's employment and Defendant was fully aware of the incident prior to making its decision to hire Plaintiff. (ECF No. 82, 3.) According to Plaintiff, "[i]t defies logic that [he] would be terminated for an action that Defendant knew about prior to his hiring and chose to disregard in making its hiring decision." (*Id.*) The point is well-taken. Although evidence in the record may show that the pre-acceptance investigation of Plaintiff was to determine if the Fayette County incident involved criminal conduct and differed in purpose and/or application from any post-acceptance investigation of the same, a reasonable jury could disregard any such distinction and determine that, because Defendant hired Plaintiff with knowledge of the actions for which it now claims served as part of the bases of Plaintiff's termination, such justifications were pretext for discrimination. Moreover, implicit in Plaintiffs' argument is a contention with the sincerity of Defendant's instant rationale. Notably, the Fayette County Incident was not originally stated by Defendant as an independent ground for Plaintiff's separation, rather, it was added later. (*Compare* ECF No. 76-7, 46:12–47:15, *with id.* at 15 (letter of separation); *see also* ECF No. 75-

1, 19:43.)   As noted by the Sixth Circuit, "An employer's changing rational for making an adverse employment decision can be evidence of pretext."  *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996).  For the above reasons, the Court hold that a reasonable jury could find that Defendant's separation of Plaintiff for the Fayette county incident was in fact pretext for unlawful discrimination.

*Jihadist Characterizations*

The Court finds that a dispute of material fact reasonably calls into question whether Defendant's separation of Plaintiff for posting photos of or associating with persons posting photos of images allegedly related to Jihadist/terrorism has in basis in fact.  Plaintiff disputes that any of the photos referenced by Defendant are related to Jihadist imagery or terrorism.  (*See* ECF No. 76-1, 210:18–211:8; *see also* ECF No. 76-2, 252:16–253:6, 255:13–255:23; ECF No 76-5, 59 (Bates Stamp 000548).).  Interestingly, Defendant displays uncertainty as to whether such photos are indeed related to Jihadist imagery or terrorism, as evidenced by its constant reference to the photos as "*arguably* related to Jihadist".  (ECF No. 79, 3:7, 10–11(emphasis added).) Moreover, despite DR 136 addressing posts by employees, the record contains evidence that Plaintiff did not take or post any photos, including those characterized as Jihadist or terrorist related, while he was an employee.  (ECF No. 76-2, 207:11–207:13; ECF No. 76-5, 61–62 (Bates Stamps 000550 & 000551).)  Accordingly, a genuine dispute of material fact, as to whether Defendant's separation of Plaintiff for posting photos or associating with persons posting photos related to Jihadist/terrorism has any basis in fact or was instead pretext for unlawful discrimination, precludes this Court from finding that Defendant's request for summary judgment is supported based on the instant justification.

*Silenced Firearm*

The Court additionally finds a dispute of material fact as to whether Defendant's separation of Plaintiff for a posting of a photo of him holding an illegal silencer has any basis in fact or was in, instead, pretext for unlawful discrimination.  Plaintiff disputes the factual basis of the allegation, *i.e.*, he asserts that the silencer is not illegal but, rather, as he told Defendant, his friend JJ Lee, who took the picture, was the owner and possessor of the silenced gun and had the necessary stamp to possess it.  (ECF No. 279:14–280:24; *see id.* at 240:20–240:22; ECF No. 76-5, 69:10–69:16; *id.* at 57 (Bates Stamp 000546); *see also* ECF No. 76-1, 190:24–191:20; *id.* at 13:16–13:20 (taped transcription).)  Although Plaintiff's contention may fairly be considered as a dispute of the interpretation of company policy, as opposed to a dispute of the underlying facts, *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558–59 (6th Cir. 2009), the Court does not find the distinction of significance here; even if the instant dispute does not attack Defendant's basis in fact for the instant separation the record contains evidentiary support for the conclusion that another recruit also posted photos of a suppressed weapon but was not confronted about it or disciplined for it.  (ECF No. 76-2, 200:15–203:5, 320:22–321:17.)  Moreover, despite DR 136 and DR 401 addressing the posting, transmission, or dissemination of digital media displaying a firearm by then employees and/or members, the record contains evidence that Plaintiff did not post, transmit, or disseminate any photos, including those containing weapons or a silencer, while he was an employee.  (*Id.* at 207:11–207:13.)  With these facts, the Court finds that a dispute of material fact concerning the factual basis of Defendant's instant grounds for separation precludes an entry of summary judgment based on Plaintiff's instant justification.

*Attitude during Training*

The Court finds that a reasonable jury could determine that the remaining reason asserted as a ground for Plaintiff's separation—his reserved attitude during training—was in fact pretext for discrimination.  As previously noted, "An employer's changing rational for making an adverse employment decision can be evidence of pretext."  *Thurman*, 90 F.3d at 1167.  Here, Plaintiff's separation papers did not include Plaintiff's attitude during cadet training as one of his grounds for separation.  (*Compare* ECF No. 76-7, 46:12–47:19, *with id.*at 15 (letter of separation); *see also* ECF No. 75-1, 19:43.)  Moreover, Frisch stated that Plaintiff's demeanor during training, which essentially was, as compared to other cadets, unresponsive or desensitized to the stressful training environment of the Academy, was not unusual.  (ECF No. 76-1, 78:23– 79:12.)  Frisch reasoned that this type of response is common in the Academy because it is typical of what persons with military experience or training in other police academies exhibit. (ECF No. 76-1, 79:5–79:12.)  Accordingly, the Court finds that a reasonable jury could determine that Defendant's separation of Plaintiff for his reserved attitude during training was in fact pretext for discrimination.  Included in all of this Court's findings regarding pretext is the conclusion that the evidence presented allows a reasonable jury to conclude that Defendant's separation of Plaintiff was not the result of an honestly held belief, *i.e.*, Defendant's reliance on the particularized facts presented as the bases of Plaintiff's separation was not an informed and considered decision.  Accordingly, the Court finds that Plaintiff has presented evidence sufficient to raise a genuine issue of material fact as to pretext.  *Hackshaw*, 2011 U.S. Dist. LEXIS 110613, at *23–24.

d. Cat's Paw Theory of Liability

Proof of Frisch's discriminatory animosity toward Plaintiff does not itself establish Defendant's liability, however, because Frisch was not the decisionmaker with regard to the

relevant adverse employment action.  Instead, Berryhill made the ultimate decision to separate Plaintiff.  (ECF No. 76, 24:5–24:25; *see id.* at 41:23–42:23.)  Nonetheless, Plaintiff may be able to hold Berryhill liable, and hence Defendant liable, for Frisch's discriminatory animus through a theory known as cat's paw liability.  The Supreme Court, in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011), defined cat's paw liability as follows: "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." *Id.* at 1194 (emphasis omitted).  Under the theory, if a decisionmaker undertakes an investigation which results in an adverse action for reasons unrelated to the supervisor's original biased action, the employer will not be liable.  *Id.* at 1193.  On the other hand, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.*  In other words, Courts refuse to completely absolve an employer based on its claim to have conducted an independent investigation.  *Id.* ("We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect.").  Therefore, under *Staub*, Frisch's discriminatory animus can be imputed to Berryhill, making Defendant liable, where Plaintiff can show (1) Frisch "intended . . . to cause an adverse employment action" and (2) Frisch's discriminatory action "is a proximate cause of the ultimate employment action."  *Id.* at 1194.

*Frisch's Intent*

The Court finds that Plaintiff asserts a number of facts that would allow a reasonable jury to conclude that Frisch intended that Plaintiff be disciplined or separated.  Defendant conducted three investigations of Plaintiff.  Frisch initiated and, in large part, conducted the first investigation of Plaintiff.  (ECF No. 76-1, 46:12–51:23.)  Frisch, admittedly, was "highly, highly

suspicious" of Plaintiff and/or Plaintiff's behavior from the time he first investigated Plaintiff until the final investigation of Plaintiff because he thought Plaintiff might try to infiltrate the MPD as part of a terrorist organization and commit malicious insider attacks.  (*Id.* at 49:13–50:23, 65:23–66:12, 68:20–69:13; *see* ECF No. 76-1, 128:8–128:10 (showing that Frisch referenced Plaintiff as a person that "could be a real bad guy" when requesting background information about Plaintiff); *see also id.* at 182:24–183:10   (providing evidence reasonably supporting the conclusion that Frisch felt Plaintiff was not fit for a career in law enforcement).) Nonetheless, Frisch felt as though he could not conceivably charge Plaintiff with criminal charges as a result of the first investigation, *i.e.*, his hands were tied.  (*Id.* at 50:21–51:20.)

Frisch was also involved with initiating and helping conduct the second investigation of Plaintiff.  (*Id.* at 81:8–82:3, 155:5–155:7.)  The second investigation of Plaintiff, *i.e.*, the first investigation of Plaintiff after his entry into the Academy, was initiated through a conversation between Frisch and Barrett.  The parties admit that Frisch's conversation with Barrett and his subsequent investigation occurred outside the chain of command.  (ECF No. 79-1, 7:72–8:72; *see* ECF No. 76-7, 39:18–43:24.)  Certain evidence in the record also supports the conclusion that, thereafter, when trying to get formal approval or ratification to perform the second investigation of Plaintiff, which included the check of Plaintiff's social media sites, Frisch asked Beasley for permission to investigate Plaintiff and/or see Plaintiff's files but Beasley declined; Frisch, instead, got permission to investigate from Chandler, who he refers to as his "superior, superior officer".  (ECF No. 76-7, 31:12–32:20; ECF No. 76-1, 80:19–81:16.  *But see* ECF No. 76-1, 82:4–82:5 (showing where Frisch references Chandler as his direct supervisor).)  A reasonable jury could determine that the chain of command or established rules were broken by Barret and Frisch's conversation and actions, and were arguably bent when Frisch went to his superior,

superior supervisor for permission to investigate Plaintiff after getting denied the same permission from Beasley.  Like the first investigation, this second investigation did not directly lead to Plaintiff's separation, but it did indirectly, by providing much of the factual bases for which Plaintiff was later separated.  This conclusion is especially supported in light of Frisch admitting that he knew this type of information would be relevant to an investigation into and determination regarding Plaintiff and/or his conduct by ISB.  (ECF No. 76-5, 180:18–180:25, 182:24–183:10.)  Given that an intent of discrimination can be inferred where established rules or chains of command are bent or broken to negatively impact a protected person, *Gilster v. Humana, Inc.*, No. 1:14-CV-961, 2016 U.S. Dist. LEXIS 5953, at *19 (S.D. Ohio Jan. 19, 2016); *see, e.g.*, *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998), Frisch's instant behavior reasonably favors a determination that Plaintiff satisfies the intent element of cat's paw liability.

Second, at the end of the September 28 interview of Plaintiff, Frisch concluded that although he found Plaintiff's alleged behavior inappropriate, there was "not a thing" that the MPD or OHS could use to conclude that Plaintiff was part of a terrorist cell or was infiltrating the police.  (ECF No. 76-1, 180:3–180:21, 184:9–184:19.)  As noted, however, Frisch knew that the inappropriate behavior he took issue with, although not handled by the MPD or OHS, was handled by the ISB.  (ECF No. 76-5, 180:18–180:25, 182:24–183:10.)  That same day, the third investigation into Plaintiff was launched, which was handled by ISB's Detective Johnson.  Although Frisch denies the occurrence, Johnson presented evidence showing that within a day of making the above statement, Frisch told Johnson that Plaintiff and his cousin "may be a terrorist cell or something like that[; t]hat was a possibility.[4]  (*Id.* at 47:23–48:13.)  Frisch admits that if

---

[4]  Although Defendant objects to Johnson's statement as hearsay, (ECF No. 76-5, 47:23–48:19), the Court finds that the admission made by Frisch as offered by Plaintiff, is likely admissible under Fed. R. Evid.

he would have made such a statement, it would be false and against every policy of Defendant. (ECF No. 76-1, 201:17–202:2, 203:10–204:3.)  Because intent of discrimination may be inferred from the provision of falsehoods, *Chattman*, 686 F.3d at 351–52, or where established rules or chains of command are bent or broken to negatively impact a protected person, *Gilster*, 2016 U.S. Dist. LEXIS 5953, at *19; *see, e.g.*, *Carter*, 132 F.3d at 644, and evidence exists tending to show that Frisch provided the instant information to Johnson knowing it to be false and against every policy of Defendant's, a reasonable jury could determine that Plaintiff's instant argument favors a finding that Plaintiff satisfies the first element of cat's paw liability.

Moreover, a reasonable jury could determine that Frisch, in his memorandum to Berryhill, withheld and/or mischaracterized information about Plaintiff in a way unfavorable to Plaintiff.  In his memorandum, Frisch states, "ELKHAYYAT stated while in Jordan, he was alone in the hotel room and had no contact with anyone.  (ECF No. 79-1, 20:107–21:107.)  Plaintiff, however, also told Frisch that he stayed in Jordan because he had to do some kind of paperwork.  (*See* ECF No. 76-1, 6:19–6:22, 7:14–7:15 (taped transcription).)  Nonetheless, Frisch did not provide in his memorandum that Plaintiff was staying at the hotel while he was getting some paperwork done.  This is directly apparent from the record and implicitly apparent from Berryhill's statement that he thought the circumstances of Plaintiff's trip were odd because "[n]ormally [when] you're going on a vacation, [you]'re going to visit or [you]'re going to travel, [you]'re going to sightsee or do something[; s]o that is out of the norm to me."  (ECF No. 76, 28:4–28:14.)  As an interesting side, Plaintiff, in his deposition, states that the paperwork he took two days to complete was a kind of permit needed to cross a bridge into Jordan, where he

---

801(d)(2)(A), as an opposing party admission, regardless of whether it was made by Frisch in his representative or individual capacity, *compare* Fed. R. Evid. 801(d)(2)(A), *with* ECF No. 76-5, 47:23–48:13; *see also United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005); *Estate of Shafer v. Comm'r*, 749 F.2d 1216, 1219–20 (6th 1984).

previously lived for four years.  (ECF No. 76-2, 12:21–12:24, 290:22–291:8.)  Thus, a jury could reasonably determine that Frisch knowingly provided Berryhill false information and/or lied by omission.  *Chattman*, 686 F.3d at 351–52 (affirming that intent of discrimination may be inferred from the provision of falsehoods); *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008) (noting that imputing on an individual an intent of discrimination, in a discrimination claim, is supported where an individual selectively informs senior management about an incident without informing senior management about other conduct relevant to the circumstance).

The same may be said regarding the findings presented to Berryhill by Johnson, who was influenced by Frisch in making his determination.  Importantly, some of the information provided by Frisch to Johnson could reasonably be considered as false or as a mischaracterization of fact, and Johnson, by his own admission, could not have made many of the determinations he did without Frisch providing these opinions and conclusions.  (ECF No. 76-5, 44:4–48:19 (showing that Frisch offered Johnson and Johnson adopted in conclusory fashion, Frisch's arguably one-sided/incomplete opinion and/or conclusion that Plaintiff possessed an illegal silencer, that photos relating to Plaintiff were associated with Jihadist/terrorism, and that Plaintiff may be a terrorist cell or something like it, despite Plaintiff refuting the conclusions or the existence of evidence weighing against such a conclusion); *see id.* at 41:18–41:21, 43:15–43:17, 110:20–111:24, 44:3–47:21.)  For the above reasons, the Court finds that Plaintiff sufficiently presents evidence from which a reasonable jury could conclude that Frisch intended that Plaintiff be disciplined or separated, and accordingly, the first element of cat's paw liability is satisfied.

*Proximate Causation*

The second prong of the *Staub* rule requires Plaintiff to present evidence showing that Frisch's alleged discriminatory actions were the proximate case of Plaintiff's separation. Cat's paw liability attaches when the biased intermediate employee's actions are "a causal factor of the ultimate employment action." *Staub*, 131 S. Ct. at 1193. The intermediate employee's actions need not be the sole cause of the adverse action; "[t]he decisionmaker's exercise of judgment is also a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes." *Id.* at 1192 (emphasis in original). An employer is liable for an intermediate employee's discrimination when there is proof of a "causal nexus" between the discrimination and the adverse action, *Madden*, 549 F.3d at 677, *i.e.*, when the intermediate employee influences the unbiased decision-maker to take an adverse action, *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008). Additionally, the Court notes that a biased employee's "position [of] influence" is probative of that employee's ability to influence the ultimate decisionmaker. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998).

The Court finds that Plaintiff has presented evidence from which a reasonable jury could find the presence of a causal nexus between Frisch's alleged discrimination and Berryhill's separation of Plaintiff and/or that Frisch influenced Berryhill to take an adverse action against Plaintiff. In the instant case, Plaintiff's separation was instituted by Berryhill. (ECF No. 76, 24:4–24:25.) Berryhill stated that, to make his decision, he relied on the totality of the circumstances as presented by Johnson's findings regarding Plaintiff's compliance with Defendant's policies and procedure as well as the investigation conducted by Frisch, including the findings and conclusions thereof. (*Id.* at 24:20–25:7, 42:5–42:9.) More specifically, Berryhill said he considered photos related to Plaintiff posted on social media, Frisch's

descriptions and characterization of said photos, the statements from Plaintiff's interview with Frisch as articulated by Frisch, Frisch's characterization of what occurred during his interview of Plaintiff, and other findings and/or conclusions made by Frisch.  (ECF No. 76, 25:24–28:24, 27:3–30:19.)

The Court holds that a reasonable jury could find that Frisch (an intermediate employee) directly and, through Johnson, indirectly influenced Berryhill (the decisionmaker) in a discriminatory manner to take an adverse action against Plaintiff, and that said influence was a proximate cause of Plaintiff's separation.  This is so through Frisch's memorandum to Berryhill and his assertions about Plaintiff's conduct to Johnson during Johnson's investigation of Plaintiff, which were provided to Berryhill as the bases of his decision.  Although Berryhill states that Frisch and Johnson were not a part of the decision-making process and did not influence his decision, while admitting that their responsibility was to conduct an investigation and give the findings and/or conclusions thereof to Berryhill to make a decision, (*Id.* at 42:1–42:12), the record provides sufficient evidence on which a jury could find that for Berryhill to make his decision he necessarily relied on Frisch's findings and characterizations of Plaintiff's answers as well as Johnson's recommendation.  By way of example, the Court notes that Berryhill separated Plaintiff based, in part, on the determination that Plaintiff gave evasive answers.  (*Id.* at 25:13–28:24.)  When asked what question Plaintiff was evasive on, Berryhill had to reference Frisch's notes and/or records to recall that he found Plaintiff evasive about his trip to Jordan.  (*Id.* at 27:10–28:14.)  When asked more detailed questions on the issue, Berryhill admits that he only knew what Frisch reported to him, which according to the record, did not include some of the information that Plaintiff in fact conveyed to Frisch, like why Plaintiff was in Jordan.  (*Id.* at 28:15–28:24.)  As another example, the Court refers to Berryhill's testimony

about the silencer allegedly illegally possessed by Plaintiff.  Notably, Berryhill states that he did

not even know the picture depicted the allegedly illegal silencer until Frisch told him.  (*Id.* at

29:9–29:11.)  In that same deposition discussion, Berryhill states that he only knew what Frisch

provided to him, which was based on Frisch's characterizations.  (ECF No. 76, 28:16–28:24.)

With this, a reasonable jury could determine that Frisch's investigative findings and conclusions

inevitably influenced Berryhill's decision, as it served as the factual bases for his decision.

The same could be concluded regarding the findings presented to Berryhill by Johnson,

which Berryhill relied on in making his separation decision, the latter of whom was influenced

by Frisch in making his determinations.   As previously discussed, Johnson, to make his

recommendation to separate Plaintiff, relied on photos provided by Frisch, (ECF No. 76-5,

25:19–25:25); Frisch's characterization of what the photos meant or depicted, (*id.* at 44:4–48:13;

*see also id.* at 75 (Bates Stamp 000564)); Frisch's memorandum of his interview of Plaintiff, (*id.*

at 31:21–31:25); his meeting with Frisch, (*id.* at 40:20–40:23); etcetera.  Importantly, much of

the information provided by Frisch to Johnson could reasonably be considered as false or as

containing omissions of fact (*e.g.*, that Plaintiff possessed an illegal silencer or that Plaintiff was

a part of a terrorist cell despite Frisch concluding otherwise immediately prior to making such

allegations to Johnson), and Johnson, by his own admission, could not have made some of the

determinations he did without Frisch providing his opinions and conclusions, much of which

Johnson adopted in conclusory fashion.  (*id.* at 44:4–48:13 (showing that Johnson adopted in

conclusory fashion Frisch's opinion and/or conclusion that Plaintiff possessed an illegal silencer,

that photos relating to Plaintiff were associated with jihadist/terrorists, and that Plaintiff might be

a part of a terrorist cell or the like); *see also id.* at 41:18–41:21, 43:15–43:17, 110:20–111:24,

44:3–47:21, 201:1–201.)   As a result, Frisch's influence over Johnson, in light of Johnson's

influence over Berryhill, also favors a finding of the causal nexus requirement. *Chattman*, 686 F.3d at 351–52 (affirming that intent of discrimination may be inferred from the provision of falsehoods); *Madden*, 549 F.3d at 677 (noting that imputing on an individual an intent of discrimination, in a discrimination claim, is supported where an individual selectively informs senior management about an incident without informing senior management about other conduct relevant to the circumstance).

Furthermore, with Frisch's position, as a matter of entity organization, requiring him to present facts serving as the bases of Berryhill's decision, he was highly influential in the decision-making process.  The same can be said about Frisch's influence over or suggestions to Johnson in his investigation, which was inevitably provided to and relied on by Berryhill.  This would reasonably support a jury determination that Frisch influenced Berryhill as the ultimate decisionmaker. *Ercegovich*, 154 F.3d at 354–55.  Thus, the Court cannot say that the findings of Johnson were not influenced by Frisch and that both the investigative findings and conclusions of Frisch and the recommendation by Johnson were "unrelated" to Berryhill's action.  Moreover, the evidence presented supports the conclusion that Defendant's separation of Plaintiff was not the result of an honestly held belief in its proffered justifications because the employer did not make an informed and considered decision before separating Plaintiff, *i.e.*, Defendant's reliance on the facts presented to it as the bases of its separation decision was not reasonable. *Allen*, 545 F.3d at 398; *Jenkins v. Nashville Pub. Radio*, 106 F. App'x 991, 95 (6th Cir. 2004).  A reasonable jury could determine that as a matter of entity organization and Frisch's own actions, he was indirectly involved in the decision-making process and that during that process, he misinformed and/or selectively informed the decisionmaker about Plaintiff.  Accordingly, Plaintiff has presented evidence from which a reasonable jury could find the presence of a causal

nexus between Frisch's alleged discrimination and Berryhill's separation of Plaintiff and/or that Frisch influenced Berryhill to take an adverse action against Plaintiff. Thus, Defendant's Motion for Summary Judgment, as to Plaintiff's discrimination claims, should be DENIED.

First Amendment

Plaintiff asserts that Defendant's actions constitute both an unlawful interference with Plaintiff's right to free exercise of his religion and an unlawful interference with Plaintiff's right to free association, in violation of the First Amendment to the U.S. Constitution as made actionable through 42 U.S.C. § 1983. (ECF No. 26, 5:19–5:20.) Section 1983 provides a method for vindicating federal rights conferred elsewhere. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Thus, the plaintiff's injury must flow from the execution of the municipality's policy or custom. *Garner v. Memphis Police Dep't.*, 8 F.3d 358, 361, 363–64 (6th Cir. 1993). "But policy or custom does not have to be written law; it can be created 'by those whose edicts or acts may fairly be said to represent official policy.'" *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010) (quoting *Monell*, 436 U.S. at 694). A municipality can be held liable for a single decision by a policymaker if the official is the one who has the final authority to establish municipal policy with respect to the action ordered. *Id.* Similarly, a municipality can be liable for a decision made by a subordinate if the decision was ratified by a final policymaker. *Arnold v. City of Columbus*, 515 F. App'x 524, 538 (6th Cir. 2013). However, mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification. *Arnold*, 515 F. App'x at 538 (citations and quotations omitted).

"[C]ivil rights plaintiffs are not required to plead the facts demonstrating municipal liability with particularity, [instead] the complaint must be sufficient to put the municipality on notice of the plaintiff's theory of liability." *Brown v. Gupton*, No. 14.2934-JDT-dkv, 2016 U.S. Dist. LEXIS 14156, at *7 (W.D. Tenn. Feb. 5, 2016) (citations omitted).  With this understanding, the Court considers each of Plaintiff's First Amendment claims below.

*Free Exercise of Religion*

The Court finds that Plaintiff's Amended Complaint fails to state a First Amendment claim against Defendant for a violation of his free exercise of religion.  The right to hold religious beliefs, guaranteed by the "Free Exercise" Clause of the First Amendment, is absolute. *Sherbert v. Verner*, 374 U.S. 398, 402 (1963).  The right to express those religious beliefs is also guaranteed by the Free Exercise Clause but is not absolute.  *Id.* at 403; *Wis. v. Yoder*, 406 U.S. 205, 220 (1972) ("[A]ctivities of individuals, even when religiously based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare, or the Federal Government in the exercise of its delegated powers.") Moreover, "[A] plaintiff asserting a free exercise claim must allege a burden on his religious practice that endured at least to some extent as a result of the wrongful conduct."  *Burley v. Abdellatif*, No. 16-cv-12256, 2018 U.S. Dist. LEXIS 44390, at *26 (E.D. Mich. Jan. 26, 2018).

Here, although Plaintiff states that Defendant Berryhill retained final decision making power in Plaintiff's separation, rendering him the final authority to establish municipal policy with respect to Plaintiff's separation, Plaintiff fails to allege or set forth evidence showing how Defendant interfered with his ability to practice his religion.  To the contrary, Plaintiff's Amended Complaint contains only conclusory assertions that Defendant interfered with his free exercise of religion without asserting that his religions practice has been burdened.  (ECF No. 26,

1, 5:19–5:20; ECF No. 75, 18–19.)   Although Plaintiff's summary judgment filings are not considered a part of his pleadings, the Court further notes that neither Plaintiff's Response nor Sur-Reply to Defendant's instant Motion for Summary Judgment sufficiently articulate Plaintiff's instant First Amendment claim.   (*See* ECF No. 75, 17–18; ECF No. 82.)   Such lacking allegations fail to sufficiently put Defendant on notice of Plaintiff's theory of liability.   *Burley*, 2018 U.S. Dist. LEXIS 44390, at *26.   As a result, Defendant City of Memphis's Motion for Summary Judgment as to Plaintiff's First Amendment claim for free exercise of religion is GRANTED.

*Freedom of Association*

The Court additionally finds that Plaintiff's Amended Complaint fails to state a First Amendment claim against Defendant for violating his freedom of association.   Encompassed within the protections of the First Amendment is the right to freedom of association.   *See generally* U.S. Const. Amend. I; *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 68 (2006).   While the Supreme Court has not established clear boundaries on the right to free association, the Court has recognized two distinct components: (i) the right of intimate association encompasses the right to enter into and maintain certain close and intimate human relationships, such as family relationships; and (ii) the right to expressive association protects "the right to associate for purposes of engaging in those activities protected by the First Amendment—speech, assembly, petition for redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 617–18 (1984).   Plaintiff makes the instant claim pursuant to his right of intimate association, arguing that DR 110, which "prohibits officers and cadets from 'knowingly socializ[ing] or hav[ing] a business relationship with another person, who has been imprisoned or convicted of a felony, or who are known criminals, except in the performance of

their official police duties[,]'" (ECF No. 75, 19–20), is unconstitutionally broad under both intermediate and rational basis scrutiny.  (ECF No. 75, 20–21.)  In support of his argument Plaintiff cites *Beecham v. Henderson Cnty.*, 422 F.3d 372 (6th Cir. 2005); *Reuter v. Skipper*, 832 F. Supp. 1420 (D. Ore. 1993), and *Dunn v. McKinney*, 622 F. Supp. 259 (D. Wyo. 1985).

Plaintiff was separated for a violation of DR 110 based on his alleged cohabitation or socialization with his cousin, a relationship that, for purposes of summary judgment, the Court finds is entitled to First Amendment protection.  "The Court has long recognized that . . .  it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State."  *Roberts*, 468 U.S. at 618.  Courts reason that "personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State."  *Id.* at 618–19.  "Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others."  *Id.* at 619.  Thus, protecting these relationships from unwarranted state interference safeguards the independence to define one's identity that is central to any concept of liberty.  *Id.*

The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family, such as cohabitation with one's relatives, *e.g.*, *Moore v. East Cleveland*, 431 U.S. 494 (1977).  Indeed, the Sixth Circuit noted the following on the issue:

> Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.  Among other things, therefore, they are distinguished by

such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.

*Roberts*, 468 U.S. 609, 619–20 (1984).

Notably, the type of "family" referenced contemplates more than the traditional members of the nuclear family.  *See, e.g.*, *Moore*, 431 U.S. at 504 ("Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family.  The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition.").  Here, the record reflects that Plaintiff used to live with his cousin and his cousin's parents (Plaintiff's uncle and aunt), including at the time of his application to the Academy.  (ECF No. 76-2, 30:22–33:9; *compare* ECF No. 76-5, 96:2–96:7, *with id.* at 59 (Bates Stamp 000548); *see also* ECF No. 76-1, 21:22–22:14 (taped transcription providing, in part, that Plaintiff and his cousin are like brothers and stick close together).)  Upon consideration, and for purposes of summary judgment only, the Court concludes that Plaintiff's cousin and Plaintiff's right to cohabitate with his cousin in the least, is entitled to constitutional protection under the First Amendment.[5]

The Court's First Amendment inquiry, however, does not stop there.  In reviewing whether government action has affected the right to intimate association, "[o]nly government action that has a 'direct and substantial influence' on intimate association receives heightened review."  *Flaskamp v. Dearborn Public Schs.*, 385 F.3d 935, 942 (6th Cir. 2004); *see also Strehlke v. Grosse Pointe Pub. Sch. Sys.*, No. 14-11183, 2014 U.S. Dist. LEXIS 128546, at *40 (E.D. Mich. Sept. 15, 2014).  However, lesser interferences are subject to rational basis review.  *Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004); *Flaskamp*, 385 F.3d at 942.

---

[5]  The Court withholds as unnecessary any determination about Plaintiff's First Amendment right to socialize or visit with his cousin, as Plaintiff, ultimately, fails to demonstrate that Defendant lacks a plausible policy reason for its decision.

Government action is a direct and substantial interference when "a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations.]" *Flaskamp*, 385 F.3d at 942. Rational-basis review, is satisfied "'so long as there is a plausible policy reason' for the decision, *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992), and it is 'entirely irrelevant for constitutional purposes' whether the plausible reason in fact motivated the decisionmaker, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)." *Flaskamp*, 385 F.3d at 943.

Here, the Court does not find that DR 110 and Defendant's application of it, constitute government action that has a "direct and substantial interference" on intimate association such that it is subject to heightened scrutiny. Indeed, a policy prohibiting an officer, except in the line of duty, from knowingly socializing or having a business relationship with all persons previously imprisoned, convicted of a felony, known to be criminals, or constantly in contact with law enforcement where they are listed as suspects or are being arrested for various violations, (ECF No. 79-1, 14:90–14:91), does not result in a large portion of Defendant's employees being absolutely or largely prevented from forming intimate associations, let alone are those affected by the rule absolutely or largely prevented from forming intimate associations with a large portion of the otherwise eligible population of people with whom they could form intimate associations. Such a finding supports application of rational basis scrutiny to the instant restraint. Moreover, "Restraints on government employee speech, or government employee association, not touching on a matter of public concern, are subject merely to rational basis scrutiny." *Akers v. McGinnis*, 352 F.3d 1030, 1037 (6th Cir. 2004). "The question of what

speech or association touches on a matter of public concern is by necessity a question for case-by-case adjudication." *Id.* "In general, a matter of public concern is a matter of political, social, or other concern to the community." *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999) (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Here, the Court finds that Plaintiff's association with his cousin cannot fairly be said to relate to any matter of political, social, or other concern to the community but, rather, only Plaintiff's personal or private interests. *See, e.g.*, *id.* 909–10. Accordingly, the Court finds that the instant restraint presented by DR 110 is subject only to rational basis scrutiny.

Here, the Court finds that DR 110 is rationally related to a legitimate government interest. In other words, Defendant asserts a "plausible policy reason" for its decision, *Beecham*, 422 F.3d at 378—that its basis for prohibiting MPD officers from associating with individuals having a criminal background is that said officers are held to a higher standard and certain expectations relating to public conduct and discipline. (ECF No. 79, 14; *see* ECF No. 76, 25:8–26:3.) A rational basis for the decision is therefore evident. Accordingly, summary judgment is GRANTED in favor of Defendant on Plaintiff's First Amendment freedom of association claim.

## CONCLUSION

For the foregoing reasons, the Court finds that Defendant's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. The Motion is **DENIED** as to Plaintiff's discrimination claims pursuant to Title VII, 42 U.S.C. § 1981, 42 U.S.C. §1983, and the THRA, and the Motion is **GRANTED** as to Plaintiff's First Amendment claims for unlawful interference with Plaintiff's right to free exercise of his religion and unlawful interference with Plaintiff's right to free association.

**IT IS SO ORDERED** this 21st day of September 2018.


<u>*s/John T. Fowlkes, Jr.*</u>
JOHN T. FOWLKES, JR.
United States District Judge